Drake, Ch. J.,
dissenting:
This case comes into this court under a joint resolution of Congress, (16 Stat. L., p. 664,) passed May 4, 1870, in the following words:
“That the claim of E. Diekelman, a subject of the King of Prussia, for damages for an alleged detention of the ship Essex by the military authorities of the United States, at New Orleans, in the month of September, 1862, be, and is hereby, referred to the Court of Claims for its decision in accordance with law, and to award such damages as may be just in the premises, if he may be found entitled to any damages.”
The majority of the court are of the opinion that it is “ in accordance with law ” to allow the claimant damages. I do not concur in that opinion.
On the 12th of May, 1S62, the President of the United States issued a proclamation declaring that the blockade of the ports of Beaufort, Port Eoyal, and New Orleans should so far cease and determine, from and after the 1st day of June next ensuing, that commercial intercourse with those ports, except as to persons, things, and information contraband of war, might from that time be carried on, subject to the laws of the United States, and to the limitations and in pursuance of the regulations which were prescribed by the Secretary of the Treasury in an order of the same date with said proclamation.
By the regulation referred to, every vessel clearing at a foreign port, destined to either of the ports named in that proclamation, was required- to obtain a license from a consul of the United States, upon satisfactory evidence that she would “ convey no person, property, or information contraband of war, either to or from the said ports; * * * and on leaving either of said ports she would be required to have clearance from the collector of customs according to law, showing no violation of the condition of the license.”
*385 The claimant’s ship was not detained in the port of New Orleans, by the authority of an officer of the United States, a single hour after clearance was granted to her. The detention was in obtaining the clearance, which was withheld in pursuance of orders from the military commander at New Orleans; which city was in the midst of a hostile territory, practically in a state of siege by land, and held under and governed by martial law.
When the claimant’s ship went into the port of New Orleans under those circumstances, she went there with no greater rights than any American vessel would have had under like-circumstances. She went there subject to the same law that-governed the ships of American citizens, and that was martial law. Municipal law was silent, except as martial law permitted it to be administered. Martial law was then and there, to citizens and foreigners, to American ships and foreign ships, as much a part of “the laws of the United States” as any act of Congress; or, if not, then acts of Congress could be enforced' only so far as the paramount military authority deemed it consistent with the public safety to allow them to be enforced.. So, however regarded, the law that reigned supreme over the-captured rebel city, and without which there would have been-naught but anarchy and confusion, was martial law, superior to statutes and treaties, and as indispensable to the public-safety as gravitation to the order of the universe. No man, native or alien, no ship, domestic or foreign, could enter that city or its port and claim exemption from the power of martial law, or the right afterward to reverse, in a civil court, the decrees of the military commander whose will enforced it. Martial law there was the nation’s dread necessity, which no-man, whether American, European, or any other nationality, had any right to question, either by resistance at the time, or' by subsequently demanding of the nation damages for its operation upon himself in common with all there. If the claimant saw fit to send his ship there, he took the responsibility of' her coming under the power of whatever law was in force there-, especially the law which bound all for the safety of all. Implicit obedience was, for each and all who went there, the only guarantee of freedom from damage.
The captain of the claimant’s ship saw fit to set up his will against that of the commanding general who- held the city,, *386 and be thereby suffered detention, for which the claimant demands damages. I hold him entitled to none. If men, for the sake of gain, will go into fire, they must expect to be scorched, whether they be Prussians or Americans; if they will sail into a beleaguered port, where'the presence of treason on every hand makes martial law the only hope of loyalty and order, they sail into the grasp of martial law, and if martial law grips them so hard as to leave the prints of its fingers, that is their lookout; they have no claim for indemnity on the power through whose comity they are permitted there at all.
The claimant’s ship came into the port of New Orleans with the express notice, contained in the order of the Secretary of the Treasury, that she could not go out of that port unless she had “clearance from the collector of customs according to law, showing no violation of the condition of the licenseWhen, therefore, the master of the ship applied for clearance, it was incumbent on him, as a condition-precedent, to show the collector that there was nothing in the ship the taking of which from that port would be such a violation; that is, he"was not entitled to clearance until he satisfied the collector that his ship had not on board any “ person, property, or information •contraband of war.” If he applied for clearance without showing that, the absence of that showing was an all-sufficient reason for the collector’s refusing the clearance. Much more was the fact, that was known to the military authorities, that there had been taken on board property which the commanding general held to be contraband of war. Whether it was in fact contraband of war according to public law was not the question. The claimant voluntarily sent his ship into the port of a nation which was in the midst of a war of vast proportions, for the suppreásion of a rebellion of vaster proportions than the world probably ever before saw. He sent her there knowing the conditions upon which she could obtain clearance therefrom; and knowing, too, that martial law was there to enforce those conditions. It was the duty of the master of the ship to clear his own way out, by knowing that he took nothing on board which the general commanding could have reason to believe would, at the port to which the ship would go, give aid or comfort to the rebellion. What would give such aid or comfort was not for the master, but for the military commander, to' determine. If the master assumed his right to determine that question, he *387 assumed tbe whole responsibility of his decision coming in conflict with the will of that commander, and of all the consequences. And when clearance was refused him because of what he had taken on board,' it was his duty to have immediately put the things off the ship. That he had signed bills of lading for them was no justification of his refusal to put them off. It was his business before he signed the bills of lading to know that he was not thereby to be brought in conflict with the military authority, which was supreme there. That there was a custom-house officer on the ship when the parcels were brought on board, did not dispense with the obligation on the part of the master of the ship to see that he did not cross the will of that authority. And so it turns out that, by neglecting these obvious precautions against complications, he involved himself in the detention complained of. And when he found himself so involved, instead of seeking the shortest way out of the difficulty, he planted himself in opposition to the military commander, evidently trusting to his Prussian nationality as a protection against the prompt and summary application of martial law, which would have visited any American citizen who would have ventured upon such an experiment. I deny that he was entitled to any more favor than an American citizen would have'been under the circumstances.
It is, in my opinion, quite vain to appeal to treaty provisions between Prussia and the United States as a foundation of an award of damages in this case against the latter, for the simple reason that nothing is to be found there applicable to such a case as this; that is, nothing is to be found there which applies to the case of one of the nations being engaged in the suppression of a rebellion, and a ship of the other going into a port there which is under martial law. The only treaty pfovision between this country and Prussia which is supposed to bear upon this case is Article XIII of the treaty of 1799, which was continued in force by the treaty of 1828, and is in the following words:
“Aktiole XIII. And in the same case of one of the contracting parties being engaged in war with any other power, to prevent all the difficulties and misunderstandings that usually arise respecting merchandise of contraband, such as arms, ammunition, and military stores of every kind, no such articles carried in the vessels, or by the subjects or citizens of either *388 party, to the enemies of the other, shall be deemed contraband so as to induce confiscation or condemnation and a loss of property to individuals. Nevertheless, it shall be lawful to stop such vessels and articles, and to detain them for such a length of time as the captors may think necessary, to prevent the inconvenience or damage that might ensue from their proceeding, paying, however, a reasonable compensation for the loss such arrest shall occasion to the proprietors; and it shall further be allowed to use in the service of the captors the whole or any part of the military stores so detained, paying the owners the full value of the same, to be ascertained by the current price at the place of its destination. But in the case supposed of a vessel stopped for articles of contraband, if the master of the vessel stopped will deliver out the goods supposed to be of contraband nature, he shall be admitted to do it, and the vessel shall not in that case be carried into any port nor further detained, but shall be allowed to proceed on her voyage.”
I do not propose to enter upon any extended discussion of this article, but consider it sufficient to state the reasons why I hold it to have no place here. They are as follows: 1. Because, manifestly, it was intended only for the case of a war between one of the contracting parties and some other power, and not to a case of intestine war, in which one or the other party might be involved. 2. Because it applies only to cases of the arrest of vessels on the high seas, in the progress of their voyage, and not to that of vessels entering a port which, because of such intestine war, is under martial law. And, 3. Because, if the treaty-does apply to the subject-matter of the injury done to the claimant, it does not confer on him the right to sue the United States i&r reparation for that injury. Beyond doubt a treaty is a contract, and either party to it may demand reparation from the other for any breach of it; but that right does not extend to the individual citizens or subjects of either country, for they are not parties to the treaty. If they have rights under the treaty, those rights must be asserted by the soverignty which was a party to the contract, not by them.
But if these reasons be not valid, this court, in my opinion, has no jurisdiction of this claim, as a claim growing out of or dependent upon the treaty in question; but, on the contrary, is expressly denied such jurisdiction by section 9 of the act of *389 March 3, 1863, (12 Stat. L., p. 765, ch. 92,) which is in the following words:
“ That the jurisdiction of the said court shall not extend to or include any claim against the Government not pending in said court on the first day of December, anno Domini eighteen hundred and sixty-two, growing out of or dependent on any treaty stipulation entered into with foreign nations or with the Indian tribes.”
Clearly, if the claimant had not been authorized by special resolution of Congress to sue in this court, it would not for a moment be questioned that this provision applied to his case, completely barring the prosecution here by him, of “ any claim * * * growing out of or dependent on any treaty stipulation entered into ” between Prussia and the United States. The only way in which this bar can be avoided is by showing its removal by subsequent legislation. And the only subsequent legislation which can be looked to for that purpose is the joint resolution authorizing the claimant to sue here. If the effect of that resolution. is to repeal, pro Jiao vice, the ninth section of the act of March 3,1863, then the case should be considered in the light and under the obligation of the treaty stipulation; but if such is not the effect of that resolution, then in my judgment we must consider the case wholly aside from and independent of that stipulation. In my opinion the ninth section is not only unrepealed, but entirely unaffected, by the joint resolution.
In construing that resolution, it will be remembered that this court has uniformly insisted on the strict construction of private acts of Congress. — Hubbell v. United States, (6 C. Cls. R., p. 53;) Atocha v. The United States, (Ibid., 691;) Roberts v. United States, (Ibid., p. 84.) In the former of those cases the very point was raised which is presented in connection with ttis resolution, viz, the effect of a private act of Congress as a repeal of a general law. There the court said: “Bepeals by implication are not favored in law, particularly the repeal of a general statute by a private one. The latter is to be strictly construed when opposed to the former; and the purpose of the legislature to embody in a private act a repeal, suspension, or change of a public law, must clearly appear.”
Applying these views here, we not only do not find expressed in the joint resolution any purpose to set aside the ninth section aforesaid in favor of this claimant, but to me it is plain that *390 the intention was to submit the case to this court under and subject to the general law then in force. When thé claim is referred to this court “for its decision in accordance with law,” and the law then in force denied to this court jurisdiction of ‘‘any claim growing out of or dependent on any treaty stipulation,” it is clear to my mind that Congress intended to refer to us a claim which did not grow out of or depend upon a treaty stipulation. In other words, that the ciaim was to be made out here without the aid of treaty stipulations. Otherwise the general law is, by implication, overthrown by a private act, which no where express.es the purpose to effect such a result. If it had been the intention of Congress to suspend the operation of the ninth section in question in favor of this claimant, the short and simple way to do it was to say so in so many words ; as was done in the “Act for the relief of Alexander J. Atocha,” passed February 14, 1865, (13 Stat. L., p. 595, ch. 36,) where express authority was given to consider a claim which grew out of and was dependent on treaty stipulations. In the absence, of plain expressions of an intent to suspend the ninth section aforesaid in favor of this claimant, I hold no such intent to have existed, and that the prohibition of jurisdiction contained in that section is applicable to this case so far as the claim may be supposed to grow out of or be dependent on treaty stipulations.
In no view can I see that it is “in accordance with law” to condemn the United States in damages because the captain of the claimant’s ship chose to run a tilt.against General Butler at New Orleans, and thereby suffered a detention, which it was his duty to have avoided beforehand; or, as soon as he found himself involved in it, to have relieved himself from by instant obedience to a will which was, of necessity, the ruling will of all in that city, and which was backed by a force he could not resist. The United States pays no damages to its own citizens in such cases, and I cannot see why it should pay them to the citizen or subject of another country. Were the circumstances of the two countries reversed, and an American should, in just such a case, sue Prussia, it would be admonitory and impressive to behold the.Teutonic emphasis with which the demand would be scouted from Prussian territory.